FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN - 1  AM 7: 03

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| HARRY ESSEX | CIVIL ACTION |
| VERSUS | NO. 04-2903 |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION | SECTION "C" (2) |

## FINDINGS AND RECOMMENDATION

Plaintiff, Harry Essex, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for Supplemental Security Income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a timely memorandum of facts and law. Record Doc. No. 7. Defendant filed a timely reply memorandum. Record Doc. No. 8.

Fee_____
Process_____
X  Dktd_____
✓  CtRmDep_____
Doc. No_____

I.    PROCEDURAL HISTORY

Essex filed an application for SSI on March 18, 2002, alleging disability since March 3, 2000[1] because of neck, back and hand injuries and "leg problems" resulting from an automobile accident.  (Tr. 75, 80).

After plaintiff's application was denied, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 23, 2003.  On September 24, 2003, the ALJ denied plaintiff's application.  (Tr. 17-25).  After the Appeals Council denied review on August 27, 2004 (Tr. 4-6), the ALJ'S decision became the final decision of the Commissioner for purposes of this court's review.

II.   PLAINTIFF'S REQUEST TO REOPEN A PRIOR CLAIM

Plaintiff states in his memorandum that he filed a previous claim on October 3, 2000, which was denied on October 23, 2000.  Although he did not appeal that decision, Essex asks in his memorandum that his prior claim be reopened.  He cites no law that would permit this court to reopen a claim that was never appealed to the Appeals Council and became final more than four years ago.

---

[1]"Claimants applying to the SSI program may not receive payments for a period predating the month in which they apply for benefits."  Rosetti v. Shalala, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335) (emphasis added); accord Brown v. Apfel, 192 F.3d 492, 495 n.1 (5th Cir. 1999). "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid." Hector v. Barnhart, 337 F. Supp.2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; Brown, 192 F.3d at 495 n.1).  Thus, if plaintiff were found to be disabled, he would only be entitled to benefits beginning in April 2002, despite his allegation that he has been disabled since March 2000.

Only "final decisions" of the Commissioner are subject to judicial review. Califano v. Sanders, 430 U.S. 99, 107-08 (1977); Brandyburg v. Sullivan, 959 F.2d 555, 559 (5th Cir. 1992). Section 405(g) of the Act provides: "Any individual, after any <u>final decision</u> of the Secretary <u>made after a hearing</u> to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . ." 42 U.S.C. § 405(g) (emphasis added). Section 405(h) provides: "The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. <u>No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided</u>." <u>Id.</u> § 405(h) (emphasis added). "A 'final decision' is a particular type of agency action, and not all agency determinations are final decisions." <u>Bacon v. Sullivan</u>, 969 F.2d 1517, 1519 (3d Cir. 1992) (citing <u>Califano</u>, 430 U.S. at 107-08).

To preserve his right to seek eventual judicial review of the Commissioner's "final decision" denying benefits, a claimant who has received an unfavorable decision from an ALJ, must request, within 60 days of his receipt of the decision, that the Appeals Council review the ALJ'S decision. <u>Brandyburg</u>, 959 F.2d at 559; <u>Harper by Harper v. Bowen</u>, 813 F.2d 737, 739 (5th Cir. 1983); 20 C.F.R. § 416.1468(a) (2004). If he does

not request and receive an Appeals Council decision that either accepts the case for review or denies review, the ALJ'S decision is binding and the claimant has lost his right to judicial review of the decision. Harper, 813 F.2d at 739; 20 C.F.R. §§ 416.1455, 416.1481.

According to plaintiff's memorandum, the Commissioner denied his prior claim only 20 days after receiving it. Therefore, the claim never went to the level of a hearing before an ALJ, which is a prerequisite for any right to appeal to this court. According to plaintiff's memorandum, he did not request any further review of the initial denial.

Thus, this court has no jurisdiction to review the Commissioner's decision denying benefits because it is not a "final decision" as defined by the Act. Accordingly, IT IS RECOMMENDED that his request to reopen that decision be DENIED.

III.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ erred by failing to obtain an updated residual functional capacity opinion.

B.   The ALJ erred by failing to develop the record regarding plaintiff's mental impairment.

C.   The ALJ erred by ignoring evidence favorable to Essex.

4

IV.   **ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL**

The ALJ made the following relevant findings:

1.   Essex has severe impairments consisting of hypertension, chronic obstructive pulmonary disease, status post multiple trauma which includes left-sided jaw fracture open reduction and internal fixation, and history of alcoholism.

2.   Plaintiff's high blood pressure and inability to open his mouth are non-severe impairments.

3.   His impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.   Plaintiff's allegations regarding his limitations are not totally credible.

5.   Essex has the residual functional capacity to perform light work with occasional climbing, balancing, stooping, kneeling, crouching and crawling.  He is restricted from climbing ladders, ropes and scaffolds and from work that requires balance. In addition, speaking would not be a consideration of employment.

6.   He cannot return to his past relevant work.

7.   Plaintiff has the residual functional capacity to perform a significant range of light work with some restrictions.

8.   There are a significant number of jobs in the national economy that Essex could perform, such as assembly worker, hand packer and janitor.

(Tr. 19, 24).

V.     ANALYSIS

    A.     Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in

its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2003).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2]  The five-step

_____

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period

7

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Newton, 209 F.3d at 453.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions

---

of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that he was 45 years old, with a ninth grade education and no specialized training or education. (Tr. 34, 47). He said that he had stopped working about two and one-half years before the hearing. He stated that he used to work in construction and house leveling. (Tr. 34-35).

Essex testified that he has had lockjaw for 10 years and cannot open his mouth. He said his doctors at Charity Hospital said they were going to try to break his jaw and repair it surgically, but they had not been able to do so because of his high blood pressure and did not want to subject him to surgery until his pressure came down. (Tr. 35). He stated that his doctors also said something about his chest and heart and that they had taken images of his heart, but they had not reported back to him yet. He said his next appointment was on August 10, 2003. (Tr. 35-36). He guessed that his doctors are afraid to give him an anesthetic because of his blood pressure and his heart.

Plaintiff stated that he sees a different doctor every time he goes to Charity Hospital. He said he did not know what was wrong with his heart, only that one doctor told him that his chest pain was related to his heart. Essex testified that his chest hurts "a

9

whole lot" and that he cannot walk more than two blocks before he has to sit down and rest for about five to ten minutes because of the pain. (Tr. 36, 38).

Essex stated that he also has liver problems and that he sees the same doctor, Dr. Oliver, regularly for his liver. (Tr. 36). He said that he drinks a couple of beers every now and then, such as when he goes to a party. He stated that he has back pain that comes from his neck when he walks. He said his doctor was going to remove a bone from his neck and some from his back but will not perform surgery until he has his mouth repaired. (Tr. 37).

Plaintiff testified that he can stand for about 40 minutes before his legs give out and he has to sit down. He said the problem was mostly with his right leg as a result of being hit by a car in 2001.[3] He stated that he can sit for about an hour. Essex said that he tosses and turns and has trouble sleeping every night. (Tr. 38-39). He said he sleeps for 15 to 20 minutes, then gets up and walks around, then falls asleep again for 15 to 20 minutes and gets up again. He also stated that he has trouble working with other people because he cannot think and cannot stand to be around a lot of people because he is embarrassed and has low self-esteem. He said he never used to feel this way. Essex said he has friends but does not like to be in a crowd.

---

[3]According to the medical records, the accident occurred on April 3, 2000.

Plaintiff testified that he has been losing a lot of weight because he cannot eat and he has to squeeze food into his mouth. He said he weighs about 120 pounds. (Tr. 40). He said he goes to the grocery store and can lift a gallon of milk. He said that he could lift a five-gallon paint bucket about one year ago but that his back hurts if he does it for too long. He also testified that his hands are stiff. (Tr. 41).

Essex stated that these problems began after he was hit by a car on February 10, 2001[4] and that he has not worked since then. He said the accident occurred when he was standing by a bus stop, a car hit him and he fell forward into the windshield. (Tr. 41-42). When asked whether he was intoxicated at the time, plaintiff testified that he had just come from a party. (Tr. 42).

Plaintiff stated that he has cut back to smoking two or three cigarettes per day. (Tr. 43). He said that he does not have the money to buy blood pressure medication and he does not receive any free medications. He stated that he uses aspirin and Tylenol. He testified that he cannot brush his teeth and that his gums bleed when he tries. (Tr. 44).

C.   Vocational Expert Testimony

Vocational expert, Cindy Harris, testified that she had reviewed plaintiff's file and been present during his testimony. (Tr. 45). The ALJ posed a hypothetical of a 45 year-

---

[4]As previously noted, the medical records indicate that the accident occurred on April 3, 2000.

11

old claimant with a ninth grade education, who alleges disability since age 42 and who can lift and carry 20 pounds occasionally and 10 pounds frequently; who can occasionally climb, balance, stoop, kneel, crouch and crawl but can never climb ladders, ropes or scaffolds or balance; and who can speak and communicate but who could not perform a job that required constant talking. (Tr. 46, 48).

Harris testified that such a claimant could not perform plaintiff's past relevant work, which was unskilled with no transferable skills. She stated that the claimant could perform light, unskilled assembly work, hand packaging work and janitorial work, all of which exist in Louisiana and the national economy. (Tr. 49).

The vocational expert said that any employee must report for work on time and that an individual who could not do so, because of illness, drinking or for any other reason, more than once per month, would not be able to keep his job. (Tr. 49-50). She stated that employees normally are allowed two 15-minute breaks and a lunch break of one-half to one hour in an eight-hour shift. (Tr. 50). She further testified that an employee who needed to take additional break periods for any reason or who could not maintain concentration or pace to complete the tasks assigned in an eight-hour day would be subject to termination. (Tr. 50-51).

Upon cross-examination by plaintiff's attorney, Harris testified that an individual who could not stand for more than 40 minutes or sit for more than an hour without pain that would require him to rest for five to ten minutes would not be able to perform any of the jobs she had listed. (Tr. 51).

D.   Medical Evidence

I have reviewed the medical records in evidence and the ALJ'S summary of the medical evidence. (Tr. 20-22). I find the ALJ'S summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections, and highlights noted below.

E.   Plaintiff's Appeal

    1.   *The ALJ did not err by failing to obtain an updated residual functional capacity opinion.*

The ALJ found at the fourth step of the sequential evaluation that Essex has the residual functional capacity to perform a significant range of light work[5] with the restrictions noted in his opinion. Plaintiff argues that the ALJ erred because he relied "solely on the outdated reports of the non-examining State Agency physicians," Record

---

[5]"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job is also in this category if it involves very little lifting but requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(a). To be considered capable of performing a full or wide range of light work, the claimant "must have the ability to do substantially all of these activities." Id.

Doc. No. 7, plaintiff's memorandum at p.6 (emphasis added), that were prepared in May 2001 and June 2002.

First, the ALJ did not rely "solely" on the reports that plaintiff challenges. Rather, the ALJ properly considered the record as a whole, as he stated in his opinion. Salas v. Barnhart, No. 03-50409, 2004 WL 34812, at *1 (5th Cir. Jan. 6, 2004); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).

Second, the ALJ appropriately relied on the May 2, 2001 Physical Residual Functional Capacity Assessment prepared by the State agency physician, Anthony M. Scardino, M.D., who found that Essex was capable of performing light work. (Tr. 218-25). Contrary to plaintiff's argument, Dr. Scardino's assessment is not outdated. It was prepared within and based on medical records from the time frame for which plaintiff claims disability, from March 3, 2000 to the date of the ALJ'S opinion.

Third, the Commissioner's regulations require the ALJ to consider the findings of State agency medical and psychological consultants, who are considered experts in the Social Security disability programs and whose findings of fact about the nature and severity of an individual's impairments are considered as opinions of non-examining physicians and psychologists. The ALJ must consider these opinions and explain the weight given to them. SSR 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2,

1996) (citing 20 C.F.R. §§ 404.1527(f), 416.927(f)).  The ALJ did as he was required to do in the instant case.

Although Essex does not assert it as error, the ALJ should not have relied on the Physical Residual Functional Capacity Assessment dated June 7, 2002 because it was not prepared or signed by any medical expert, but only by a DDS examiner.  (Tr. 226-33). However, this error does not affect the ALJ'S findings, which are supported by substantial evidence in the record even without this report.

"[A]n ALJ may properly rely on a non-examining physician's assessment when, as in this case, those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician."  Villa, 895 F.2d at 1023.  In the instant case, Dr. Scardino's findings concerning plaintiff's residual functional capacity are supported by the consultative examination performed by Miljana Mandich, M.D., an internist, on March 19, 2001 and by the medical record.

Dr. Mandich's findings are adequately summarized in the ALJ'S opinion.  Dr. Mandich diagnosed mild hypertension with a history of non-compliance with medication. (Tr. 211).  He also diagnosed mild chronic obstructive pulmonary disease secondary to smoking cigarettes, and found that plaintiff had only vague complaints of shortness of

15

breath and low backache.  Dr. Mandich did not suggest that plaintiff's activities should be restricted in any way.  (Tr. 211).

Furthermore, the medical record consists of treatment records from January 17, 2000 through June 2, 2003, which substantially support the ALJ'S findings.  Essex was admitted to the hospital on January 17, 2000 for epistaxis (nosebleed) that would not stop and some dizziness.  Both problems resolved during his admission, and he reported no further problems during followup appointments.  (Tr. 184-85, 188, 190, 197).

During his hospital admission on March 3-4, 2000 after being hit by a car, aside from bruises, abrasions and intoxication on admission, plaintiff had no complaints except for bilateral hand pain.   X-rays of his hands were normal except for some old degenerative changes in his right wrist.  (Tr. 170, 179).  The subsequent medical records do not reflect any significant problems with plaintiff's hands.

On August 28, 2000, a CT scan of plaintiff's head showed mild generalized cerebellar and cerebral atrophy but no evidence of any acute intracranial process.  (Tr. 167, 178).  On November 1, 2000, Essex denied any dizziness except when he gets hot and said he had only occasional chest pain for a few seconds while running or walking. (Tr. 164).  In March 2002, he denied shortness of breath.  (Tr. 142).  On July 18, 2002, he told the examining doctor that he could walk one mile, although he told the staff doctor

16

that he had dyspnea (breathlessness) on exertion after three blocks.  Pulmonary function tests were deferred until after plaintiff had surgery to open his jaw.  (Tr. 265).

Plaintiff's later treatment records indicate that his blood pressure was better controlled.  (Tr. 240-41, 265, 267, 286).

Essex had work-ups by the pulmonary, chest and hepatology clinics at the Medical Center of Louisiana in late 2002 and early 2003 to clear him for surgery to correct his immobilized jaw.  The doctor in the chest clinic discharged plaintiff, finding that he had no clinical findings of any significance based on CT scans and x-rays of his chest and that he was clinically asymptomatic in his pulmonary functioning.  (Tr. 282-83, 287). Plaintiff's weight on December 5, 2002 was 124 pounds, but he denied recent significant weight loss, stating that his highest lifetime weight had been about 137 pounds. (Tr. 288-89).  In December 2002, although he was using a crutch to walk because of a complaint of chronic back pain or injury from a motor vehicle accident, Essex reported that he could walk one-half mile without chest pain or shortness of breath.  (Tr. 286, 288-89).  Records following these two appointments do not reflect that plaintiff was using a crutch to walk.

In February 2003, plaintiff stated that tightness in his chest from walking seven blocks went away when he sat down and that he had no other complaints except nosebleeds.  (Tr. 280, 282).  Because of his alcoholic hepatitis and cirrhosis of the liver,

his abdomen was mildly tender with liver enlargement but no ascites[6] and he had no complaints other than occasional nosebleeds. The only medication he took was aspirin. (Tr. 280).

Although the pulmonary clinic cleared Essex for surgery, he apparently did not receive clearance from the hepatology clinic. The physician in the dental clinic noted on February 24, 2003 that, if surgery were performed, Essex would require a tracheostomy[7] secondary to his history of epistaxis and that, because ankylosis[8] surgery usually involves a large blood loss, plaintiff could ill afford the elective surgery with the present state of his liver disease. (Tr. 281). By June 2003, plaintiff still had not had the jaw surgery, but it was still being recommended. Essex reported at that time that he had been experiencing chest pain on exertion for the past six months. (Tr. 275, 279).

At virtually every appointment in the hepatology clinic, Essex was counseled to stop drinking. He reported at times that he had cut back from six to one, two or three beers per day (Tr. 142, 242, 251, 262, 265), but on October 28, 2002 and February 11,

_____

[6]Ascites is an "effusion and accumulation of serous fluid in the abdominal cavity." Dorlands Illustrated Medical Dictionary 158 (29th ed. 2000) (hereinafter "Dorlands").

[7]A tracheostomy or tracheotomy is the "creation of an opening in the anterior trachea for insertion of a tube to relieve upper airway obstruction and facilitate ventilation." Dorlands at 1858.

[8]Ankylosis is "immobility or consolidation of a joint due to disease, injury, or surgical procedure." Dorlands at 91.

2003, he again reported drinking a six-pack of beer per day.  (Tr. 240, 282).   On

October 10, 2002, the staff physician in the hepatology clinic stated that Essex had been

noncompliant with abstinence from alcohol, medications and other recommendations, and

that he would provide no further work ups until Essex committed to comply with current

medications and treatment.  (Tr. 242).

   In addition, plaintiff, who had a 20-year history of smoking a pack of cigarettes

each day, was advised to stop smoking (Tr. 142), yet he continued to smoke up to one-

half pack of cigarettes per day.  (Tr. 252).

   A medical condition that can reasonably be remedied by surgery, treatment or

medication is not disabling.  Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988);

Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Bridges v. Massanari, No. 00-2639,

2002 WL 202221, at *3 (E.D. La. Feb. 7, 2002) (Vance, J.).  In addition, a claimant's lack

of need for prescription medication or failure to seek treatment is a relevant factor to

consider is determining the severity of an alleged impairment.  Anthony v. Sullivan, 954

F.2d 289,  295 (5th Cir. 1992); Villa, 895 F.2d at 1024; Hoffman v. Barnhart, No. 1:00-

CV-605, 2002 WL 31220354, at *11 (E.D. Tex. Oct. 4, 2002) (Hines, M.J.).  Plaintiff's

exclusive use of over-the-counter aspirin and Tylenol for his pain and his failure to

comply with his treatment regimens for hypertension and liver disease, including taking

19

his blood pressure medication and quitting drinking and smoking, support the ALJ'S

conclusion that plaintiff's impairments were not disabling.

The record, viewed in its entirety, including Dr. Scardino's residual functional

capacity assessment and Dr. Mandich's consultative examination report, substantially

support the ALJ'S finding that Essex can perform light work with the restrictions noted

in his opinion. Accordingly, this assignment of error lacks merit.

    2.    *The ALJ did not err by failing to develop the record regarding*
           *plaintiff's mental impairment.*

Plaintiff argues that the ALJ failed to develop the record regarding his mental

impairment by ordering a psychological examination.  He bases this argument solely on

Dr. Mandich's observations during his consultative examination that Essex was a poor

historian (an observation that was echoed in plaintiff's ongoing treatment records), had

a CT scan of his head that showed mild generalized cerebellar and cerebral atrophy, was

slow in responding and was probably of borderline intelligence.  (Tr. 207-12).

Plaintiff never claimed a mental impairment when he applied for SSI, during the

hearing before the ALJ or in any of his submissions to the ALJ or the Appeals Council.

Dr. Mandich noted that plaintiff reported no psychiatric illnesses.  (Tr. 280).  The only

indication in the record of any such problem was on October 24, 2002, when plaintiff

stated that he was anxious and he was given a referral to a psychiatric clinic, but no

records indicate that he ever followed up with that referral.  (Tr. 241).

> The claimant has the burden of proving his disability and the ALJ has
> a duty to fully develop the facts, or else the decision is not supported by
> substantial evidence.  The ALJ'S duty to investigate, though, <u>does not
> extend to possible disabilities that are not alleged by the claimant or to those
> disabilities that are not clearly indicated on the record</u>.  Because [plaintiff]
> never raised the issue of mental impairment until this appeal, [plaintiff]
> cannot say that he put his mental impairments before the ALJ.

> [Plaintiff] also cannot rely on the record to prevail on this issue. The
> record contains some references to [plaintiff's] anxiety, stress, and
> depression, but these comments were isolated and [plaintiff] was not treated
> for them. . . .

> As explained above and unlike <u>Latham v. Shalala</u> on which plaintiff
> also relies, the ALJ did not have evidence sufficient to suggest that a mental
> impairment exists. In <u>Latham</u>, the claimant was diagnosed as having mental
> problems and a somatoform disorder, which is characterized by physical
> symptoms that cannot be explained by objective medical evidence; the ALJ
> erred by not considering whether the diagnosed disorders were responsible
> for his physical symptoms.  No comparable evidence exists in [plaintiff's]
> case.  Accordingly, the ALJ had no duty to develop the possibility of
> [plaintiff] having a mental disability.

<u>Leggett</u>, 67 F.3d at 566 (citing <u>Latham v. Shalala</u>, 36 F.3d 482, 484 (5th Cir. 1994))

(footnotes omitted) (emphasis added).

Because Essex never alleged any mental impairment and because no such

impairment is clearly indicated on the record, the ALJ did not err by failing to develop the

record concerning any such impairment.  This assignment of error lacks merit.

21

3.    *The ALJ did not err by ignoring evidence favorable to Essex.*

Plaintiff's final contention is that the ALJ "completely ignored" several medical reports and notations that reveal more debilitating impairments than the ALJ found. To the contrary, the ALJ specifically stated that he carefully considered the entire record and his review of specific medical reports indicates that he actually did so.

Although the ALJ did not specifically address each of the medical reports in his opinion, "procedural perfection in administrative proceedings is not required and procedural improprieties will constitute a basis for remand only if they would cast into doubt the existence of substantial evidence to support the decision." Hall ex rel. Hyman v. Apfel, No. 98-1727, 1999 WL 350082, at *(E.D. La. May 28, 1999) (Duval, J.) (citing Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988) (citing Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)); accord Newton, 209 F.3d at 458; Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989). The ALJ's failure expressly to discuss every medical report is not error that prejudices plaintiff's substantive rights, Newton, 209 F.3d at 458; Morris, 864 F.2d at 335, because the ALJ'S decision is supported by substantial evidence, as discussed in Subsection (1) above.

Furthermore, the medical reports that plaintiff cites do not demonstrate any more severe impairments or functional limitations than the ALJ recognized. Followup reports

to plaintiff's January 2002 hospitalization for epistaxis and dizziness note that these problems had resolved. (Tr. 184-85, 188, 190, 197). The chest clinic discharged Essex from its service after reviewing his tests, including the April 3, 2000 CT scan of his chest that plaintiff cites, because he had no clinical findings of any significance and he was clinically asymptomatic in his pulmonary functioning. (Tr. 282-83, 287).

Plaintiff's low weight, ranging from 118 to 124 pounds in the records, may have been the result of his inability to open his mouth more than a few millimeters for the past 10 years, as he contends in his memorandum. However, he told one physician in December 2002 that he had not experienced any recent weight loss and he had never weighed more than 137 pounds (Tr. 288-89), and he told Dr. Mandich that he had a poor appetite, had always been thin and had not recently experienced any significant weight loss. (Tr. 212).

Plaintiff points to the September 2000 findings by a treating physician that he had a broad-based gait, inability to walk on heels and toes, diminished ankle and knee reflexes and diminished sensory response to pinprick in all extremities. (Tr. 165). These findings were not corroborated and indeed were contradicted by later examinations. Dr. Mandich found in March 2001 that, although Essex ambulated somewhat slowly, his spine, back and peripheral pulses were normal and all extremities were symmetrical. Essex had only

23

slightly decreased range of motion of his ankles and normal range of motion in all other joints. He had normal tone and strength in all muscle groups, equal circumference measurements of both calves, 1+ symmetrical deep tendon reflexes, normal superficial sensation and a normal gait. (Tr. 210).

As he is clearly entitled to do, the ALJ in this case weighed conflicting medical opinions and resolved the conflict in favor of Dr. Mandich's opinion. Newton, 209 F.3d at 452; Moore, 919 F.2d at 905. "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Martinez, 64 F.3d at 176 (quotation omitted).

More importantly, plaintiff does not present any evidence or even argument that these medical reports which the ALJ supposedly ignored establish any functional limitations that prevent him from working. "The mere presence of some impairment is not disabling per se. Plaintiff must show that [he] was so functionally impaired by [his impairment] that [he] was precluded from engaging in any substantial gainful activity." Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983) (citations omitted).

Accordingly, Essex has failed to establish that the ALJ erred in this respect.

## CONCLUSION

The ALJ did not err by failing to obtain an updated residual functional capacity opinion, failing to develop the record regarding plaintiff's mental impairment or ignoring evidence favorable to Essex.  Substantial evidence supports the ALJ's finding that plaintiff can perform light work with the restrictions noted in his opinion.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's request to reopen his prior claim be DENIED.  IT IS FURTHER RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  Douglass v. United

Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __*3/50*__ day of May, 2005.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

26